**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

_____

METRO URGENT CARE &
FAMILY MEDICAL CENTER,

           Plaintiff,

v.                                       Case No. 21-10394

STATE FARM FIRE AND CAS. CO.,

           Defendant.
_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN**
**PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

       The flat roof on Plaintiff Metro Urgent Care's clinic began leaking in April 2020.

The property insurer, Defendant State Farm, declined coverage for the leak and all

resulting damages. Plaintiff subsequently brought this breach of contract action, and

Defendant now moves for summary judgment. (ECF No. 16.) Defendant argues that it

should be granted summary judgment on the entire claim because Plaintiff breached the

policy when it failed to give Defendant a reasonable opportunity to inspect the roof

before Plaintiff had it replaced. Alternatively, Defendant seeks a ruling barring damages

incurred by a tenant from being included in the claim and finding that a large portion of

Plaintiff's alleged loss of business income—related to COVID-19 testing—is purely

speculative. The court finds a hearing unnecessary. E.D. Mich. L.R. 7.1(f)(2). For the

reasons provided below, the court will grant in part, and deny in part, Defendant's

motion for summary judgment.

## I. BACKGROUND

Plaintiff Metro Urgent Care owns a small single-story building in Lincoln Park, Michigan, that houses the medical practice of its proprietor Dr. Throphilus Ulinfunm. (ECF No. 16, PageID.197.) Plaintiff also leases a portion of its building to a physical therapist, charging $1,200 for rent each month. (*Id.*) Defendant stipulates that the building was covered by a valid State Farm Medical Office property insurance policy during the period at issue. (*Id.*) In addition to covering the physical property, the policy includes an endorsement covering the clinic's "loss of income and extra expense" resulting from a covered loss. (ECF No. 16-2, PageID.280-83.)

In early April 2020, the insured building first experienced a roof leak that caused significant interior water damage to the facility. (ECF No. 16, PageID.197.) Dr. Ulinfunm testified that the interior damage to his building severely limited his use of the premise relegating his practice to (mostly) telehealth visits and reducing the clinic's income.[1] (ECF No. 16-10, PageID.364-65.) Dr. Ulinfunm contends he was not able to fully utilize the facility until after he had the roof replaced and the interior was restored in September 2020. (*Id.*) In addition to reducing the clinic's normal medical practice, Plaintiff argues that the damage prevented the clinic from entering the bourgeoning COVID-19 testing market that arose when the State of Michigan was impacted by the Novel Coronavirus pandemic in the spring of 2020. Plaintiff contends this caused a substantial loss in practice revenue. (*Id.*) The tenant physical therapist likewise indicates

---

[1]     The parties dispute how much the practice was forced to reduce its operations and to what extent the physical damage to the building, as opposed to the COVID-19 pandemic, precipitated any reduction in operations. (*Compare* ECF No. 16-10, PageID.364-65, *with* ECF No. 16-10, PageID.364-65.)

that his business sustained physical damage to its equipment and was forced to suspend operations resulting in a substantial loss of business income. (ECF No. 16-11, PageID.389.)

Dr. Ulinfunm reported the roof leak and interior damage to Defendant State Farm on April 7, 2020. (ECF No. 16, PageID.197.) Dr. Ulinfunm testified that after he first discovered the water damage, he immediately contacted his State Farm agent who initiated a claim and advised Ulinfunm to find a roofer who could quickly mitigate the ongoing leak. (ECF No. 16-10, PageID.363.) Plaintiff hired a roofer, L.D. Lopez, who photographed the roof and did an immediate "temporary repair to stop the water from draining or raining into the clinic." (*Id.*)

But Defendant soon rejected Plaintiff's initial claim. After personally inspecting the building's flat roof on April 13, 2020, Defendant's "external claim's representative," Ray Hester, issued a letter to Plaintiff stating that the "[d]amage to the roof and the exterior are a result of wear, tear, deterioration and/or cracking or maintenance." (ECF No. 16-4, PageID.316.) Because it found the building did not sustain a covered cause of loss—wind or storm damage—Defendant denied Plaintiff's initial claim in its entirety. (*Id.*)

Defendant's initial denial of the insurance claim caused the parties to engage in an extended sequence of back-and forth-communications during the summer of 2020. Michael Rickman, the general contractor who oversaw the roof's previous replacement in 2011, conducted an inspection and photographed the roof on May 5th, 2020. Rickman noticed a single "two feet by two feet" patch on the roof. (ECF No. 16-7, PageID.330.) Because the "aluminum coping that caps the top of the parapet wall" was

3

missing on the southwest corner, he theorized that "[i]t looked like maybe [the coping] had blown off and penetrated the roof" where it had recently been patched. (*Id.*) Following his inspection, Rickman authored a May 20, 2020 letter stating that the missing coping and damage was consistent with "wind damage" and advised Plaintiff to pursue a claim against its insurance company. (ECF No. 16-6, PageID.325.) In his deposition, Rickman further explained that age and general condition of the roof were unlikely to be the cause of the leak because the type of roof installed should last roughly 25 years and that the roofing material required "no maintenance." (ECF No. 16-7, PageID.333.)

A copy of this new report was provided to Hester, who was unsatisfied with its findings, and Hester issued another official letter in June 2020 denying the claim. (ECF No. 16, PageID.199.) But after communicating with Plaintiff's counsel, Hester agreed to personally reinspect the roof in August 2020.[2] (ECF No. 16-3, PageID.311.) Hester attests that he again inspected the roof on August 23, 2020 with Inmer Lopez of LD Roofing, the firm Plaintiff had hired to make the initial emergency repairs. (ECF No. 16-3, PageID.312.) According to Hester, Lopez pointed "a two-to-three-inch hole" in the roof and showed Hester "areas along" a roofing seam "where the seam had worn" which Lopez claimed was "caused by wind."[3]  (*Id.*, PageID.313.) Hester attests, however,

---

[2]     The parties disagree on whether adjuster Ray Hester had two or three total opportunities to physically inspect and photograph the damaged roof. (*See* ECF No. 18, PageID.416 (contending that Hester inspected the roof three times); ECF No. 16-3, PageID.311 (stating that only two inspections actually occurred due to a scheduling issue).) For the purposes of summary judgment, however, the court finds this factual dispute to be immaterial.

[3]     Inmer Lopez also provided Plaintiff with an undated "roofing inspection report" indicating that there was a "crack on roof cover, due to wind damage" and that "20 feet of metal" coping was missing "due to weather conditions." (ECF No. 19-8, PageID.485.)

based on his experience, that he did not think such damage could be caused by wind. (*Id.*)

When Plaintiff's counsel continued to dispute Defendant's denial of the claim, Hester agreed to hire a third-party engineer to inspect the roof on Defendant's behalf. (*Id.*) The inspection was scheduled to occur on September 11, 2020. But on Thursday, August 27, 2020, Dr. Ulinfunm contacted State Farm stating that the roof was leaking again. Defendant contends that Dr. Ulinfunm did not indicate during the call to State Farm that he intended to initiate further repairs. (*Id.*)

When heavy rains over the weekend caused further water damage to the building, Dr. Ulinfunm testified he began looking for a roofer who could quickly effectuate a permanent repair to the roof "in order to mitigate any further damage to my business." (ECF No. 16-10, PageID.368.) Dr. Ulinfunm hired a roofer, Lawrence Bird, to fix the active leak, and Bird completed the repairs on Monday, August 31, 2020. (ECF No. 19-7, PageID.473; ECF No. 16-9, PageID.353.) Bird testified in his deposition that when he inspected the roof, he found that a large amount of aluminum coping around one corner of the building had blown off. (*Id.*, PageID.473.) He theorized that when the coping "blew off the wind got underneath . . . [the roofing material and] lifted the roof which caused it to crack in the seams and let a lot of water in." (*Id.*) In the damaged corner, "[w]e had to cut that complete section out, replace the underlayment, [and] . . . replace the sub-roof." (*Id.*) Bird's company then placed a new sealant layer over "the

---

But Lopez has not yet been deposed as part of this action. (ECF No. 16, PageID.201.) And while Defendant contends that "Lopez is no longer Plaintiff's expert," (*see Id.*), Plaintiff responds that it still intends to call Lopez as a fact witness because he performed the initial repairs and points out that Lopez is still on Plaintiff's witness list (*see* ECF No. 18, PageID.426; ECF No. 10, PageID.174 (Plaintiff's Witness List)).

entire roof." (*Id.*, PageID.476.) Before making repairs, Bird took pictures of the roof to document its condition, which Plaintiff has attached as an exhibit. (ECF No. 19-10, PageID.488-505.)

The same day the roof was being repaired, August 31, 2021, Plaintiff's counsel mailed a letter to State Farm indicating that Plaintiff would be "replac[ing] the flat roof immediately" to prevent additional damage. (ECF No. 16-9, PageID.353.) Thus, State Farm was unable to complete the planned independent engineering inspection or otherwise inspect the latest leak as it did not receive the letter until after the repairs occurred. (ECF No. 16, PageID.202.)

Following the commencement of the present litigation, Plaintiff filed a statement of damages claiming a total of $321,516 in damages. (ECF No. 14, PageID.184-85.) Broken down, Plaintiff claims approximately $59,000 in physical damages and restoration costs, $5,000 in lost rental income, $66,000 in lost practice income, $110,925 in lost "COVID-19 Test Income," and an additional $80,000 for damage incurred by the physical therapist tenant. (*Id.*)

Defendant filed the present motion seeking summary judgment against Plaintiff's whole claim because "Plaintiff breached the policy's conditions when it repaired the roof before the engineer could perform an inspection." (ECF No. 16, PageID.207-213.) Alternatively, Defendant seeks a ruling declaring that (1) "Plaintiff's claim for damages . . . to his tenant's property above the policy's limit to that coverage must be dismissed," and (2) that "Plaintiff's claims for loss of COVID-19 testing income are purely speculative." (*Id.*, PageID.204-06.)

6

## II. STANDARD

To prevail on a motion for summary judgment, a movant must show—point out—that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). First, the moving party bears the initial burden of presentation that "demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no requirement, however, that the moving party "support its motion with [evidence] negating the opponent's claim." *Id.* (emphasis removed); *see also Emp'rs Ins. of Wausau v. Petrol. Specialties, Inc.*, 69 F.3d 98, 102 (6th Cir. 1995).

Second, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis removed) (quoting Fed. R. Civ. P. 56(e)). This requires more than a "mere existence of a scintilla of evidence" or "'[t]he mere possibility of a factual dispute." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (quoting *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). For a court to deny summary judgment, "the evidence [must be] such that a reasonable [finder of fact] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. All reasonable inferences from the underlying facts must be drawn "in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015).

## III. DISCUSSION

### A. Insured Duties in the Event of Loss

Defendant first argues that it should be granted summary judgment in toto

because Plaintiff breached the policy's reasonable inspection provision when it opted to

replace the roof before it was inspected by an independent engineer. (ECF No. 16,

PageID.207-09.) In support, Defendant points to "Section I" of the "State Farm

Businessowner's" Policy issued to Plaintiff, which explains a policy holder's duties in the

event of a loss:

> (1) You must see that the following are done in the event of loss to
>     Covered Property:
>       . . .
>     (b) Give us prompt notice of the loss. Include a description of
>         the property involved.
>       . . .
>     (d) Take all reasonable steps to protect the Covered Property
>         from further damage, and keep a record of your emergency
>         and temporary repair expenses necessary to protect the
>         Covered Property, for consideration in the settlement of the
>         claim. . . However, we will not pay for any subsequent loss
>         resulting from a cause of loss that is not a Covered Cause
>         Of Loss. Also, if feasible, set the damaged property aside
>         and in the best possible order for examination.
>       . . .
>     (f)  As often as may be reasonably required, permit us to
>         inspect the property proving the loss and examine your
>         books and records.
>         Also permit us to take samples of damaged and
>         undamaged property for inspection, testing and analysis,
>         and permit us to make copies from your books and records.
>       . . .

(ECF No. 16-2, PageID.251-52.) Because "Michigan . . . courts have consistently held

that failure to comply with an insurance policy's duties after loss is a complete bar to

[recovery]," Defendant argues that Plaintiff's alleged violation of subsection (f) of the

policy provision (requiring reasonable inspection) should completely bar his ability to

recover under the policy. (ECF No. 16, PageID.207-08 (citing *Fenton v. National Fire Ins. Co.*, 235 Mich. 147, 209 N.W. 42 (1926); *Reynolds v. Allstate Ins. Co.*, 123 Mich. App. 488, 490, 332 N.W.2d 583, 584 (1983)).)

While Defendant acknowledges that "Michigan appellate courts have never directly addressed whether an insured's failure to exhibit damaged property to his/her insurer precludes them from maintaining an action against the insurer," it cites two cases, applying Massachusetts and Maryland law respectively, as persuasive precedent supporting its position. (*Id,* PageID.209-11 (citing *Mistler v. Horace Mann Ins. Co.*, 2 Mass. L. Rptr. 619, (Super. Ct. 1994); *Hill v. Safeco Ins. Co. of Am.*, 93 F. Supp. 2d 1375, 1376 (M.D. Ga. 1999)).)

Plaintiff responds that it substantially complied "with the [reasonable inspection] conditions/duties of the [policy]" when it allowed State Farm's representative, Ray Hester, "unrestricted access" to physically inspect and photograph the roof on "three separate occasions." (ECF No. 18, PageID.434-39.) And Plaintiff points out that the same "Duties In The Event Of Loss" section of the policy at issue requires an insured take reasonable steps to perform emergency repairs to mitigate further damage. (*Id.*, PageID.439-40.) Plaintiff argues that because the first temporary repair, in April 2020 was unsuccessful, it acted reasonably by performing a more extensive repair in August 2021. (*Id.*) Further, it contends that "the facts in the instant matter are easily distinguishable from" the persuasive out-of-state precedents cited by Defendant. (*Id.*, PageID.440-41.)

Considering these opposing arguments, the court finds a question of fact remains requiring the issue to go to a jury. In this diversity action, the court applies

Michigan law, which has long recognized that failure to comply with an insurance policy's duties imposed after a loss is a complete bar to the insured's right to recover under the policy. "The conditions in policies requiring notice of the loss to be given, and proofs of the amount to be furnished the insurers within certain prescribed periods, must be strictly complied with to enable the assured to recover." *Cont'l Studios v. Am. Auto. Ins. Co.,* 340 Mich. 6, 12, 64 N.W.2d 615, 618 (1954). In Michigan "an insurance contract must be enforced in accordance with its terms." *Henderson v. State Farm Fire & Cas. Co.*, 460 Mich. 348, 596 N.W.2d 190, 193 (1999). "Terms in an insurance policy must be given their plain meaning and the court cannot create an ambiguity where none exists." *Heniser v. Frankenmuth Mut. Ins. Co.*, 449 Mich. 155, 534 N.W.2d 502, 505 (1995) (internal quotation marks omitted). The plain and ordinary meaning of undefined contract terms "may be determined by consulting dictionaries." *McGrath v. Allstate Ins. Co.*, 290 Mich. App. 434, 439, 802 N.W.2d 619, 622 (2010) (citations omitted).

It is undisputed that the policy provision at issue requires only that the insured provide Defendant State Farm a "reasonabl[e]" opportunity for inspection after a loss. (*See* ECF No. 16-2, PageID.251-52.) The provision's plain language does not *require* an inspection for an insured's claim to be valid. By eschewing a hard inspection requirement in favor of a reasonable opportunity standard, the policy provision contemplates an individualized weighing of facts. Consequently, to be granted summary judgment based upon this policy provision, Defendant must demonstrate that there is no genuine dispute of material fact regarding Plaintiff's substantial compliance with the policy's requirement of a reasonable opportunity to inspect. *See Valente v.*

*Univ. of Dayton*, 689 F. Supp. 2d 910, 922 (S.D. Ohio 2010), *aff'd*, 438 F. App'x 381 (6th Cir. 2011) ("At the summary judgment stage, however, the question is whether [the moving party] has come forward with evidence of substantial compliance and whether [the non-moving party] has submitted any evidence competent under Fed. R. Civ. P. 56 upon which a jury could find in his favor on that question.").

In the present case, it is undisputed that State Farm was able to inspect and photograph the damaged roof on at least two occasions after the initial leak. Additionally, Plaintiff has provided the testimony of multiple contractors and photographic evidence of the roof's condition immediately before it was repaired in August 2020. (*See* ECF No. 19-10, PageID.488-505.) Given this factual record, it is possible for the factfinder to conclude that such previous inspection opportunities fulfilled Plaintiff's duty under the policy provision; in the alternative, the factfinder could find that Plaintiff acted *reasonably* when it concluded the need to immediately mitigate further water damage to its building—as *required* by the policy—outweighed in urgency its duty to provide further opportunities for inspection.

Plaintiff's conduct here is readily distinguishable from the actions of the insured in the cases cited by Defendant. In *Mistler*, the insurer was granted summary judgment because the insured, who had been charged with arson, "neither permitted the insurer to enter and inspect the property nor submitted to an examination under oath" before they sold their fire-damaged home. 2 Mass. L. Rptr. at 619. And in *Hill*, an insurer was granted summary judgment after the insured—who conceded "he could. . . have preserved the discarded property for inspection" as required by his policy— but "failed to preserve the rubble and chips from the damaged 2,000 arrowheads  . . . [and]

presented only 102 arrowheads to [the insurer] upon demand." 93 F. Supp. 2d at 1380.

Neither of these cases dealt with a scenario in which the insurer had already been

provided an opportunity to inspect the damaged property, or in which the insured faced

a high probability of increasing existing damage should it delay repair efforts.

Consequently, even assuming *arguendo* that Michigan courts would have reached the

same result as did these precedents, that lends no support to Defendant's argument

for summary judgment.

Perhaps realizing the weakness of its original argument, Defendant's reply brief

now argues that the August 2020 leak constituted a "new claim, which required Plaintiff

to allow State Farm to [again] inspect the roof" regardless of whether it was provided a

reasonable opportunity to inspect the original April 2020 leak. (ECF No. 22,

PageID.542, 544 ("[A]lthough Plaintiff may have allowed State Farm to inspect the

property for the April incident, it did not permit State Farm to inspect the newly claimed

damages from the August storm.").) The court is skeptical that the failure of a previous

temporary patch, as Plaintiff's roofers testified occurred, constitutes a new, separate

claim under the policy. In any event, Plaintiff has provided testimony from roofer

Lawrence Bird that by August 27, 2020, there was a "bad leak" in the roof that could

not be fixed with another "temporary tar patch," so a more extensive repair was

immediately necessary to prevent additional damage to the building. (ECF No. 19-7,

PageID.475.) Furthermore, Plaintiff notified State Farm of the "new" leak on August 27,

2020, the day it occurred. (*See* ECF No. 16-3, PageID.313.) Even if, hypothetically,

August 2020 was the first time the roof leaked, this testimony identifies a factual

dispute regarding the reasonableness of Plaintiff's actions in which it prioritized its duty

to mitigate over its duty to allow a reasonable inspection. Defendant is free to argue to

a factfinder at trial that Plaintiff did not act reasonably in so choosing, but Defendant

has failed to establish as a factual matter that Plaintiff's actions in August 2020 were so

clearly unreasonable that summary judgment is appropriate.[4]

### B. Tenant Damages Claim

Defendant additionally argues that the court should award summary judgment

concerning specific components of Plaintiff's damages claim. Defendant first argues

that, under the terms of the policy, Defendant is not responsible for $80,000 in

damages claimed by Plaintiff's physical therapist tenant. (ECF No.16, PageID.204;

ECF No. 14, PageID.185 (Amended Statement of Damages).) In support of its

damages claim, Plaintiff provides a letter from the physical therapist claiming he

incurred both $14,000 in damage his property—rehabilitative gym equipment—kept in

the leased space, and approximately $66,000 in lost business income (or $1,000/day)

due to water damage. (ECF No. 16-11, PageID.389.) Even if the roof damage is found

---

[4]    Defendant's reply brief also raises a new argument in favor of summary
judgment—that "Plaintiff's claims are also barred by the anti-concurrent causation
doctrine." (ECF No. 22, PageID.544.) It argues that "the fact the roof leaked again is
clear and unconverted evidence that the damages were, at least in part, due to the roof
having deteriorated, due to age/or wear and tear." (*Id.*, PageID.545.) Defendant has
forfeited this summary judgment argument, based on a separate policy provision, by
"[r]aising the issue for the first time in a reply brief." *Scottsdale Ins. Co. v. Flowers,* 513
F.3d 546, 553 (6th Cir. 2008); *see also Malin v. JPMorgan,* 860 F. Supp. 2d 574, 577
(E.D. Tenn. 2012) ("It is well-settled that a movant cannot raise new issues for the first
time in a reply brief because consideration of such issues deprives the non-moving
party of its opportunity to address the new arguments.") (quotation omitted). The
argument fails on its merits in any event because, without citation to the record, it
argues that "the building leaked in different areas when it rained heavily" in August
2020. (ECF No. 22, PageID.546.) And this fact is directly contradicted by the testimony
of Michael Rickman and Lawrence Bird, who linked both the April and August 2020
leaks to water (and wind) infiltration caused by the loss of aluminum coping in the same
corner of the building. (*See* ECF No. 16-7, PageID.330; ECF No. 19-7, PageID.473.)

to be a covered loss, Defendant initially argued that any payments for the tenant's

losses must be limited to what is provided for in the "Property Of Others" declaration

contained in the policy covers the "property of others" up to a $2,500 limit. (ECF No.

16, PageID.204.)

> **21. Property Of Others**
> You may extend the insurance that applies to Business Personal
> Property to apply to personal property of others in your care,
> custody or control only while the personal property is located at
> the described premises. The most we will pay for loss in any one
> occurrence under this Extension Of Coverage is the Limit Of
> Insurance for Property Of Others shown in the Declarations.
> The amount we pay under this Extension Of Coverage is an
> additional amount of insurance

(ECF No. 16-2, PageID.248.) Defendant argues that "[t]here is no other coverage that

is available for [the tenant] under the policy." (ECF No. 22, PageID.547.)

In response, perhaps seeking to extricate itself from the $2,500 limit in the

"Property of Others" declaration, Plaintiff argues that this provision does not apply to

the tenant's claim because the tenant's personal property was *not* in the custody or

control of the Plaintiff. (ECF No. 18, PageID.413 ("Plaintiff has no care, control or

custody of any property used by the tenant.").) Fair enough. But as Defendant points

out in its reply, "Plaintiff fails to establish what provision of the subject policy would

provide coverage for the item [and lost income] that [Plaintiff] had no insurable interest

in, which are owned by a third party, who is not party to the subject policy." (ECF No.

22, PageID.547.)

Since Plaintiff has now conceded it did not have custody or control of any of the

tenant's property, under elementary principles of contract and insurance law,

Defendants must be granted summary judgment on the entire $80,000 tenant loss

claim. In Michigan, "[i]nsurance policies are contracts and, absent an applicable

statute, are subject to the same construction principles applicable to other contracts."

*Skanska USA Bldg. Inc. v. M.A.P. Mech. Contractors, Inc.*, 505 Mich. 368, 377, 952

N.W.2d 402, 406-07 (2020) (citation omitted). The contract is between the insurer and

the insured protecting him from loss. *Id.* That is why Section I of the policy explicitly

defines the scope of coverage to the building and "business personal property" by

repeatedly using the possessive pronoun "*your*."  For example, the scope of the policy

includes: "*[y]our* personal property in . . . rooms or common areas furnished by *you* as

landlord", "[p]ersonal property owned by *you* that is used to maintain or service the

buildings,"  "[p]roperty, used in *your* business." (ECF No. 16-2, PageID.237 (emphases

added).) With the limited exception of "[p]roperty of others that is in *your* care, custody

or control," as discussed above, the policy clearly contemplates no coverage for the

property of a tenant who is not party to the insurance contract. (*Id*. (emphasis added).)

Because Plaintiff admits that the physical therapist's equipment was not in the

"care, custody or control" of Plaintiff, it is not covered under the policy. Property

insurance policies covering only the structure and the owner's own property are

ubiquitous. It is for this reason that those renting a property often opt to obtain renters'

insurance to cover the contents of their rented home or office. *See Insurance*

*Information for Michigan Consumers, Renters Insurance: A Smart Buy*, Michigan

Department of Insurance and Financial Services (Nov. 2019),

https://www.michigan.gov/documents/cis_ofis_ip211_24997_7.pdf ("[T]he landlord's

insurance typically covers structural damage to his property and does not extend to your

personal property or protect you from being liable for damage in your home.").

The additional "loss of income" endorsement purchased by Plaintiff contains a similar limitation. It provides that State Farm "will pay for the actual 'Loss Of Income' *you* sustain due to the necessary 'suspension' of *your* 'operations' during the "period of restoration". (ECF No. 16-2, PageID.280 (emphases added).) Consequently, the $66,000 in lost business income allegedly incurred by the physical therapist tenant, also falls outside the scope of the policy as a third party not covered.

In sum, the court must grant Defendant summary judgment on the $80,000 claim for tenant's personal property and business income.

### C. COVID-19 Testing Income

In addition to alleged reductions in Plaintiff's normal practice income, Plaintiff claims the interior damage to its clinic delayed its entry into the bourgeoning COVID-19 testing market by 102 days. (ECF No. 14, PageID.184.) Based on records showing insurance reimbursements for COVID-19 testing later performed by the clinic from September 2020 to December 2020, Plaintiff estimates that it would have performed an average of twenty-five COVID-19 tests each day from April 2020 to August 2020, which would have produced $110,925 in additional revenue at the average health insurance reimbursement rate of $43.50 per test. (*Id.*; ECF No. 19-12, PageID.509-26; ECF No. 19-13, PageID.529.)

Defendant asserts "that the entire claim for alleged COVID-19 testing income should be dismissed, as the claim is purely speculative, and is not supported by any evidence related to testing income." (ECF No. 16, PageID.205.) Defendant argues that Plaintiff cannot prove the loss of such income with a "reasonable degree of certainty" and submits that Plaintiff's "claim is based on what Plaintiff hoped would have occurred

during those months his business was not operating at full capacity (which began after the water damage)." (*Id.*) Defendant reasons that "testing in the State and Country has not been even throughout the pandemic," and so, "there is simply no way for a juror to award such damages to Plaintiff unless they purely speculate that the number of patients requesting and receiving testing would have remained constant throughout the 102 day[]" suspension of operation. (*Id.*, PageID.206.) The court finds, however, that Plaintiff has provided sufficient evidence regarding its loss of COVID-19 to present the claim to the factfinder.

Under Michigan case law, "[f]or a plaintiff to be entitled to damages for lost profit, the losses must be subject to a reasonable degree of certainty and cannot be based solely on mere conjecture or speculation." *Bonelli v Volkswagen of Am.,* 166 Mich. App. 483, 511, 421 N.W.2d 213, 226 (1988). "However, courts do not require mathematical certainty." *Lynn Mayer's Great Lakes Glads., Inc. v. BTR of Orland, Inc.*, No. 1:17-CV-538, 2019 WL 5683931, at *3 (W.D. Mich. Feb. 15, 2019) (citing *id.*). "[E]ven where lost profits are difficult to calculate and are speculative to some degree, they are still allowed as a loss item." *Bonelli*, 166 Mich. App. at 511, 421 N.W.2d at 226 (emphases added).

In Michigan, "the uncertainty which prevents a recovery is uncertainty as to the fact of the damage and not as to its amount and that where it is certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery." *Wolverine Upholstery Co. v. Ammerman*, 1 Mich. App. 235, 244, 135 N.W.2d 572, 576 (1965) (quotation omitted). "The law requires that this evidence shall not be so meager or uncertain as to afford no reasonable basis for inference, leaving the damages to be

determined by sympathy and feelings alone. The amount of evidence required and the degree of its strength as a basis of inference varies with circumstances." *Fera v. Vill. Plaza, Inc.*, 396 Mich. 639, 644, 242 N.W.2d 372, 374 (1976) (quotation omitted).

Defendant's objections to Plaintiff's damages calculation here seem to be based on two broad factual suppositions: (1) that Plaintiff's status as a new entrant to the COVID-19 testing market makes it impossible to calculate the business it would have received in the summer of 2020, and (2) the general market demand for COVID-19 testing in 2020 was in flux making a damages calculation all the more speculative.

To determine if the evidence of subsequent COVID-19 testing revenues are sufficient to allow a jury to make reasonable inferences about the damages, the court looks to the types of evidence regarding lost profit that courts have previously found sufficient to survive summary judgment. Since Plaintiff's COVID-19 testing operation could be considered a new line of business, the court focuses on what types of evidence have been found sufficient to support claims by businesses without a substantial earnings history.

In contrast to some states that adhere to "a per se rule" precluding any recovery for "lost profits in a new business," *see* 11 Corbin on Contracts § 56.17 (2021), "Michigan courts allows lost profits for new businesses as long as they may be established with 'reasonable certainty,'" *Fredonia Farms, LLC v. Enbridge Energy Partners, L.P.*, No. 1:12-CV-1005, 2014 WL 3573723, at *5 (W.D. Mich. July 18, 2014) (citing *Fera*, 396 Mich. at 644, 242 N.W.2d at 374).

"Although Michigan courts have not explicitly listed the types of evidence that may be used to demonstrate lost profits for a new business, courts in other states have

18

examined expert reports, market analyses, comparisons to similar businesses operating under similar market conditions, and economic and financial data." *Id*. (citing 11 Corbin on Contracts § 56.17 (2012)). And, at least one state court has explicitly recognized evidence of a "company's subsequent success" as "a reasonable basis for the jury's award of . . . lost profits." *See Spinett, Inc. v. Peoples Nat. Gas Co.*, 385 N.W.2d 834, 839 (Minn. Ct. App. 1986).

Here Plaintiff has provided business records, in the form of health insurance reimbursement summaries, that demonstrate immediate demand for Plaintiff's COVID-19 testing services when the clinic first fully reopened in September 2020 following the roof repair.[5] (*See* ECF No. 19-12, PageID.510.) And the records indicate that demand for such testing remained substantial through the end of 2020. (*See id.*, PageID.526.) The court concludes that through such records and the testimony of clinic employees, that Plaintiff will be able to identify a "reasonable basis" for its claim that it would have performed a substantial number of COVID-19 tests but for the roof leak. *See Fera*, 396 Mich. at 644, 242 N.W.2d at 374 (quotation omitted). This is not a situation where a new line of business ramped up slowly over a long period of time. The fact that the clinic was able to begin immediately conducting a substantial number of COVID-19

---

[5]     The court notes that it is unable to independently verify, due to the use of arcane alphanumeric billing codes, that the reimbursement records attached to Plaintiff's responsive briefing are for COVID-19 testing and not another medical service. The court assumes that Dr. Ulinfunm or another witness will be able to authenticate and interpret these business records to verify Defendant actually performed 1,339 COVID-19 tests in 2020, as Plaintiff's briefing represents. (*See* ECF No. 19-12.)

tests leads to the conclusion that Plaintiff has, at the least, a plausible argument for lost profits[6] from the earlier months of 2020.

Defendant does not directly contest such evidence; rather, it intimates that fluctuations in public demand for COVID-19 testing varied throughout 2020, so calculating such damages would require speculation on the part of the factfinder. And Defendant requests that the court take "judicial notice" of the fact that testing demand varied substantially during 2020. Again, "mere uncertainty as to the amount will not preclude the right of recovery," *see Wolverine Upholstery Co.*, 1 Mich. App. at 244, 135 N.W.2d at 576, and Defendant remains free at trial to contest Plaintiff's estimates with "expert reports, market analyses, [and] comparisons to similar businesses operating," *see Fredonia Farms, LLC*, 2014 WL 3573723, at *5. Furthermore, given the availability of daily county-level COVID-19 testing data on the State of Michigan's website, the court notes that it is likely relatively easy to estimate changes in test demand over time. *See Coronavirus Michigan Data*, State of Michigan, https://www.michigan.gov/coronavirus/0,9753,7-406-98163_98173---,00.html (last

---

[6]     Plaintiff's "Statement of Damages" lists $110,925 in "lost revenue" from COVID-19 test reimbursements based on an average reimbursement rate of $43.50 per test. (ECF No. 14, PageID.184; ECF No. 18, PageID.433.) The full amount of this alleged loss, and other claims for "lost revenue," are unlikely to be fully reimbursable under the policy's loss of income provision. Put simply, *lost revenue* is not synonymous with *lost profits*. The policy defines a covered "Loss of Income" as "the sum of. . . [n]et Income (net profit or loss before income taxes) that would have been earned" *plus* "[c]ontinuing normal operating expenses incurred, including 'ordinary payroll expenses.'" (ECF No. 16-2, PageID.282-83.) This means that if Plaintiff was in fact reimbursed $43.50 for each test, the policy language requires that any variable costs that are usually incurred when administering a COVID-19 test—including the cost of the testing supplies—must first be deducted when calculating lost income. As a result, even a full reimbursement of "lost income" from Plaintiff's alleged missed testing is likely to be substantially less than the $110,925 in "lost revenue" currently listed in the statement of damages.

visited Dec. 14, 2021) (tracking the number of laboratory tests administered each day per county). Therefore, the court holds that a factfinder must determine if Plaintiff is owed damages for reduced COVID-19 testing revenue under the policy.

### D. Bad-Faith Claim

Finally, Defendant seeks a ruling that Plaintiff cannot "recover damages for []its insurer's alleged 'bad faith' refusal to pay," so Plaintiff's claim for bad faith "must be dismissed." (ECF No. 16, PageID.214.) While Plaintiff's complaint explicitly labels only a single (breach of contract) claim, Defendant cites Paragraph 29 of Plaintiff's complaint as the source of a separate allegation of "bad faith." (*See* ECF No. 1-1, PageID.82 ¶29 ("That State Farm's refusal to provide coverage is done in bad faith.").)

Plaintiff responds that it does intend to assert "bad faith" as a "cause of action" and "does not seek to bootstrap a 'bad faith' argument into additional penalties." (ECF No. 18, PageID.414-15.) Given this clarification, no such cause of action was raised, and Defendant's motion for summary judgment seeking to bar a "bad faith claim" will be terminated as moot.

### IV. CONCLUSION

Plaintiff has shown that a genuine dispute of material fact exists as to whether its decision to completely repair the roof in August 2020 violated the reasonable inspection provision of the property insurance policy issued by Defendant. And the court finds that Plaintiff has demonstrated a reasonable basis for allowing the factfinder to consider lost COVID-19 testing revenue in any determination of damages. However, the court holds that Defendant should be awarded summary judgment on all claims regarding damages sustained by Plaintiff's tenant as a result of the roof leak. Consequently,

IT IS ORDERED that Defendant State Farm's Motion for Summary Judgment

(ECF No. 16) is GRANTED IN PART and DENIED IN PART.

s/Robert H. Cleland                    /
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  December 27, 2021

I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, December 27, 2021, by electronic and/or ordinary mail.

s/Lisa Wagner                          /
Case Manager and Deputy Clerk
(810) 292-6522

S:\Cleland\Cleland\AAB\Opinions and Orders\Civil\21-10394.METROURGENTCARE.MSJ.AAB.RHC.docx